Todd E. Zenger (5238)
Dax D. Anderson (10168)
KIRTON & McCONKIE
1800 Eagle Gate Tower
60 East South Temple
Salt Lake City, UT  84111
Telephone:  801-328-3600
tzenger@kmclaw.com
danderson@kmclaw.com

Attorneys for Plaintiffs  Isys Technologies, Inc.,
Coded Instruction Security Corporation, and
Jason A. Sullivan

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | | |
|---|---|---|
| ISYS TECHNOLOGIES, INC., a Nevada corporation, CODED INSTRUCTION SECURITY CORPORATION,  a Nevada corporation, and JASON A. SULLIVAN, a Utah resident, | : : : : : : | Civil No.  2:11-CV-1011 DN |
| Plaintiffs, | : : | Magistrate Judge David O. Nuffer |
| v. | : : | |
| KENNETH A. MURDOCK, a Utah resident, and KENNETH K. MURDOCK, a Utah resident,  COMPUTIVE CORPORATION, a Utah Corporation, KAM SYSTEMS, LLC, a Utah limited liability company, MI, LC, a Utah limited liability company, ELIOT JACOBSEN, a Utah resident, BRIAN RHAY, a Utah resident, HUGO BOREN, a Utah resident,  BROCK BLAKE, a Utah resident, LENDIO, Inc., a Delaware Corporation, EMMA MCSWEENEY, a Utah resident,  LORRAINE LNU (LAST NAME UNKNOWN), a Utah resident,  STAN KANAROWSKI, a Utah resident,  , STEVE MUIR, a Utah resident,  ALLAN HALL, a Utah resident,  JEFF ROMNEY, a Utah resident,  LES GILBERT, a Utah resident,  and MARTIN FREY, a Utah resident,  GREG WARNOCK, a Utah resident, and JOHN DOES 1-20, | : : : : : : : : : : : : : | **AMENDED COMPLAINT**  **AND**  **DEMAND FOR JURY TRIAL** |
| Defendants. | | |

## **INTRODUCTION**

Plaintiffs Isys Technologies, Inc., Coded Instruction Security Corporation, and Jason A. Sullivan seek redress against Kenneth A. Murdock and others for bad faith, fraudulent, unfair and deceptive business practices and racketeering activities which have caused millions of dollars of damages to Plaintiffs.

## **COMPLAINT**

Plaintiffs Isys Technologies, Inc., Coded Instruction Security Corporation and Jason A. Sullivan (collectively, "Plaintiffs") file this Amended Complaint prior to any responsive pleading of any Defendant to complain against Kenneth A. Murdock, Kenny K. Murdock, Computive Corporation, KAM Systems, LLC, MI LLC, Eliot Jacobsen, Brian Rhay, Hugo Boren, Brock Blake, Lendio, Inc., Emma McSweeney, Lorraine Doe, Stan Kanarowski, Steve Muir, Allan Hall, Jeff Romney, Les Gilbert, Greg Warnock, Martin Frey and John Does 1-20 as follows:

## **PARTIES, JURISDICTION, AND VENUE**

### Plaintiffs

1.     Isys Technologies, Inc. is a Nevada corporation that is registered to transact business in Utah ("ISYS").

2.     Coded Instruction Security Corporation is a Nevada corporation that is registered to transact business in Utah ("CISC").

3.     Jason A. Sullivan is an individual transacting business in Utah ("Sullivan").

4.     Isys Technologies, Inc., Coded Instruction Security Corporation and Jason A. Sullivan (collectively "Plaintiffs").

### Defendants

5.     Kenneth A. Murdock is an individual transacting business in Utah and a resident of Utah ("Murdock Sr.").

6. Kenny K. Murdock is an individual transacting business in Utah and a resident of Utah ("Murdock Jr.").

7. Computive Corporation is a Utah corporation with its principal place of business in Utah County, Utah, with offices located at 268 South State Street, Suite 413, Salt Lake City, UT 84111 ("Computive").

8. KAM Systems, LLC is a Utah limited liability company with its principal place of business in Utah County, Utah ("KAM").

9. On information and belief, KAM is wholly-owned by KAM Investments, LLC, which is wholly-owned by Murdock Sr. The letters for "KAM" are an acronym for and are the initials of "Kenneth A. Murdock," namely Murdock Sr.

10. MI LLC is a Utah limited liability company with its principal place of business in Utah County, Utah ("MI").

11. Eliot Jacobsen is an individual transacting business for Murdock Sr. in Utah and a resident of Utah ("Jacobsen").

12. Brian Rhay is an individual transacting business for Murdock Sr. in Utah and a resident of Utah ("Rhay").

13. Brock Blake is an individual transacting business for Murdock Sr. in Utah and a resident of Utah ("Blake").

14. Lendio, Inc. is a Delaware corporation registered to transact business in the State of Utah and formerly known as Funding Universe ("Lendio").

15. Emma McSweeney is an individual transacting business for Murdock Sr. in Utah and a resident of Utah ("McSweeney").

16. Lorraine Last Name Unknown is an individual transacting business for Murdock Sr. in Utah and a resident of Utah ("Lorraine LNU").

17. Stan Kanarowski is an individual transacting business for Murdock Sr. in Utah and a resident of Utah ("Kanarowski").

18. Steve Muir is an individual transacting business for Murdock Sr. in Utah and a resident of California? ("Muir").

19. Allan Hall is an individual transacting business for Murdock Sr. in Utah and a resident of Utah ("Hall").

20. Greg Warnock is an individual transacting business for Murdock Sr. in Utah and a resident of Utah ("Warnock").

21. Jeff Romney is an individual transacting business for Murdock Sr. in Utah and a resident of Utah ("Romney").

22. Les Gilbert is an individual transacting business for Murdock Sr. in Utah and a resident of Utah ("Gilbert").

23. Martin Frey is an individual transacting business for Murdock Sr. in Utah and a resident of Utah ("Frey").

24. Hugo Boren is an individual transacting business for Murdock Sr., Computive, KAM and MI in Utah and a resident of Utah ("Boren").

25. John Does 1-20 are individuals or entities transacting business for Murdock Sr. in Utah.

<u>Jurisdiction and Venue</u>

26. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 1367 (supplemental jurisdiction) .

27. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

<u>The PCU™</u>

28.     In or about late 1999, Sullivan began developing the concept of a new method for manufacturing computers, which he named Xi3™ Technology ("Xi3™").  This method utilized:

    a.     a more closely-integrated circuitry in a smaller dimensional space;

    b.     a single computing design that could be used in virtually any computing application;

    c.     significantly fewer types of raw materials and manufacturing processes;

    d.     dramatic cost savings due to the uniformity and reduction of raw materials; and

    e.     processing units that could be added or subtracted as needed.

29.     Sullivan's concept resulted in the creation of a revolutionary new modular computer platform design for a computer's core processing technology which he named a Processing Control Unit ("PCU™").

30.     The PCU™ computer has the capability of most standard computers and can be used for all types of computing environments.  In addition, the PCU™ computer:

    a.     is approximately the size of a 3½-inch cube;

    b.     is highly durable and compact (load bearing at 3900 lbs.);

    c.     is lighter by unit (in some cases by hundreds of pounds) and thus cheaper to manufacture, ship, and support;

    d.     uses less power to operate;

    e.     has the potential for limitless vertical applications; and

    f.     is able to cluster and scale to larger processing applications.

31. The projected revenues for the PCU™ computer are approximately $130 billion in the next eighteen years (the life of the original patents).

32. The projected revenues for all Xi3™ applications are in the hundreds of billions of dollars.

Formation of ISYS

33. From 2000-2001, Sullivan continued to work on designs for the PCU™ technology and began to seek funding for further development and to patent various aspects of the Xi3™ and PCU™ Technology.

34. In 2002, Sullivan incorporated Isys Technologies, Inc., ISYS, to act as the technology licensing company for the PCU™ and other Xi3™ products.

35. Sullivan owned, and has always owned, the active and pending patents for the PCU™ and other Xi3™ technology and products. However, in 2002, Sullivan granted a license to ISYS of certain of his rights in those patents.

36. From 2002-2005, ISYS, on Sullivan's behalf, prepared and submitted provisional patents, patent applications, and international filings to prepare to establish exclusive ownership of and rights in and to the PCU™ and other Xi3™ technology and products.

Computive and the Limited License Agreement

37. Beginning in early 2004, Sullivan sought for a licensee that he was confident could capably fund the support, manufacture, and sale of PCU™ products to customers worldwide.

38. In or about mid-2004, Sullivan met with Murdock Sr. regarding the opportunity to act as ISYS's exclusive licensee for specific products in the OEM White Box desktop computer market.

6

39.     Murdock Sr. owns or has owned a wide-ranging array of assets, including a nutraceutical company and several parcels of real property.  On information and belief, Murdock Sr.'s personal net worth is over one hundred million dollars.

40.     After researching the potential for Xi3™ technology, Murdock Sr. enthusiastically agreed to join ISYS as its exclusive licensee in the OEM White Box desktop computer market.

41.     In order to participate as a licensee and manufacturer of PCU™ and/or Xi3™ products, on or before August 21, 2006, Murdock Sr. established Computive for the sole and preconceived purpose of purportedly acquiring, promoting and marketing PCU™ and Xi3™ technologies.

42.     Murdock Sr. controlled and directed Computive and its employees and agents.

43.     During August 2006 and thereafter Murdock Sr. and one or more Defendants directed Murdock's and Computive's business schemes directed at Plaintiffs.

44.     During August 2006 and thereafter agents of Murdock Sr. included Murdock Jr., Computive, KAM, MI, Jacobsen, Rhay, Boren, Blake, Lendio, McSweeney, LNU,  Kanarowski, Muir, Hall, Romney, Gilbert, Warnock, Frey, John Does 1-20,  and Ken Okasaki of the Jones Waldo firm and Scott Young of the Stoel Rives firm, both assisting the efforts of Murdock Sr., Murdock Jr., Computive, KAM and MI.

45.     Certain agents of Murdock Sr. who aided and assisted Murdock Sr., Murdock Jr. and Computive include Jacobsen, Rhay, Boren, Blake, Lendio, McSweeney, LNU, Kanarowski, Muir, Hall, Romney, Gilbert, Warnock, Frey, John Does 1-20, Ken Okasaki of the Jones Waldo firm and Scott Young of the Stoel Rives firm ("Murdock Agents").

46.     On or about August 22, 2006, ISYS entered into a certain license agreement with Computive ("License Agreement").

47. Pursuant to the License Agreement, ISYS granted Computive the worldwide right and license to make certain identified products and the exclusive worldwide right and license to make, sell, offer to sell, and distribute such products to certain manufacturers (the "Limited License"). As a result, only certain limited rights were granted to Computive under the Limited License.

48. In addition, pursuant to the License Agreement, ISYS agreed to develop an alpha-release prototype to demonstrate that the technology was viable, and to provide the prototype to Computive for review.

49. The Prototype was to be built according to the specifications identified in the License Agreement.

50. In exchange for the Limited License and the prototype development, Computive promised to exert reasonable efforts to sell products resulting in minimum royalty payments specified in the License Agreement, and to pay those royalties to ISYS.

51. Under the License Agreement, Computive foresaw and was required to pay minimum royalty payments to ISYS of thirty million dollars (US $30,000,000) within the first sixty months after the first commercial sale.

52. In addition, under the License Agreement, Computive agreed to:

   a. "[R]eview the Prototype and the Prototype Documentation [and] accept or reject the Prototype and Prototype Documentation within a reasonable period of time after delivery";

   b. Not "take any action seeking to challenge or invalidate any claim of any patent licensed hereunder, nor facilitate any other party in taking such action";

c.  "[G]ive prompt notice . . . of any third party act . . . that may infringe or misappropriate the Technology";

d.  Not make a "public announcement of the execution of this Agreement . . . without the prior written consent of both parties"; and

e.  Not "disclose to any third party any Confidential Information received from the other party."   "Confidential Information" was defined as "any and all proprietary or non-public information . . . of a party relating to any trade secret, technology . . . process, method, product [or] scientific or engineering matter".

<u>The Security Agreement</u>

53.  The License Agreement was the subject of considerable discussion among Sullivan, ISYS, Computive, Murdock Sr., Murdock Jr. and one or more Murdock Agents.

54.  The License Agreement document was finalized after counsel for all parties had negotiated and reviewed drafts of the License Agreement over a period of approximately eighteen months.

55.  The License Agreement stated that the parties would enter into a security agreement for one purpose, namely to secure ISYS' obligation to refund those portions of up-front payment that have been paid by Computive in the event that Computive elects to finally reject the prototype and prototype documentation.

56.  Furthermore, in the License Agreement, Computive agreed that except for the limited rights expressly granted to Computive the License Agreement did not transfer to Computive any other rights and that all right, title and interest in and to the Sullivan technology will remain solely with ISYS.

57. On or about August 22, 2006, the day the parties were to execute the License Agreement, Computive, Murdock Sr., and one or more Murdock Agents presented, for the first time, a copy of a security agreement to Sullivan, ISYS's President, for signature.

58. Computive, Murdock Sr., and one or more Murdock Agents had drafted the security agreement.

59. Counsel for ISYS was not available to be present at the signing of the security agreement and did not have an opportunity to review the security agreement presented to Sullivan for signing. In fact, neither Sullivan nor his counsel was aware that Sullivan would need to address the security agreement on that occasion.

60. When Computive, Murdock Sr., and one or more Murdock Agents first gave the security agreement to Sullivan to sign on behalf of ISYS, Sullivan initially refused to sign it because it was not part of the draft License Agreement papers they had negotiated for many months.

61. At that time, Murdock Sr. stated that if Sullivan did not sign the security agreement papers then presented to Sullivan, Computive would not execute the License Agreement, and their eighteen months of negotiation would be for nothing. Murdock Sr. knew that this threat, if carried out, would have caused material and irreparable harm to ISYS because ISYS had relied upon Murdock's and Computive's promises to enter in the License Agreement whereby ISYS had already contracted with a third party for PCU™ technology development.

62. Sullivan then stated that he wanted more time to permit his counsel to review the security agreement before he executed it on behalf of ISYS. Computive, Murdock Sr., and one or more Murdock Agents responded that they wouldn't wait, and they needed to finalize the License Agreement and security agreement immediately or they would not execute the License Agreement.

63. On information and belief, Murdock Sr. refused to wait any longer for execution of the License Agreement because Murdock Sr., Computive and/or one or more Murdock Agents had prior to acquiring any interest in the PCU™ technology already been unlawfully promoting and offering to sell interests in the PCU™ technology to third parties.

64. In addition, Computive, Murdock Sr., and/or one or more Murdock Agents represented to Sullivan that the only purpose of the security agreement was to protect Murdock Sr.'s money in case ISYS absconded with it and failed to build the alpha or first prototype. The security agreement, Murdock Sr. represented, was to simply ensure that ISYS would create the alpha prototype.

65. Murdock Sr. and Computive knew that ISYS had already contracted with a third party to assist in the alpha prototype development.

66. Murdock, Sr. and Computive knew that in preparation to fulfill his obligations under the License Agreement, Sullivan had negotiated a master development agreement with a company called Newport Enterprises, Inc. d/b/a D2M Technologies ("D2M") to begin the development of the alpha prototype before the License Agreement was executed. Thus, under significant duress in the circumstances, and relying upon the representations of Computive, of Murdock Sr., and of one or more Murdock Agents, including counsel Scott Young of Stoel Rives, and not being represented by counsel, Sullivan executed the security agreement on behalf of ISYS.

67. However, the security agreement Computive, Murdock Sr., and one or more Murdock Agents foisted upon ISYS did not simply secure ISYS's obligation to refund those portions of the up-front payments that have been paid by Computive in the event that Computive finally elected to reject the alpha prototype as the License Agreement required and as

11

Computive, Murdock Sr., and one or more Murdock Agents had represented to counsel-less Sullivan.

68. Instead, the security agreement also included several other new, theretofore unheard-of obligations of ISYS to Computive, which Computive, Murdock Sr., Murdock Jr. and one or more Murdock Agents intentionally did not disclose to Sullivan, including:

    a. the repayment of any amounts that Computive may advance or spend for the maintenance or preservation of the collateral;

    b. the repayment of any other expenditures that Computive may make under the provisions of the security agreement or for the benefit of ISYS;

    c. the repayment of all amounts owed under any modifications, renewals or extensions of any of the other listed obligations; and

    d. that the security agreement failed to provide a trigger for the release of any lien after the successful completion of the alpha prototype.

69. The security agreement unknowingly defined "Collateral" to include all of ISYS' patents and patent applications, as well as other personal property.

70. The security agreement unknowingly provided that Computive could seek to make ISYS give up the Collateral without any additional payment, accounting or off-set therefor to Computive if the Collateral simply became "endangered" or if ISYS failed to perform any of its duties or obligations under the security agreement.

71. The actual scope of the security agreement that Sullivan was coerced to sign without representation by counsel was far beyond the terms to which the parties had taken eighteen months to negotiate in the License Agreement and beyond the representations made to Sullivan by Defendants upon signing.

72. On information and belief, and after a careful review of the patents clearly owned by Mr. Sullivan and not ISYS, in their haste to induce Sullivan to execute the onerous security agreement, Computive, Murdock Sr., and one or more Murdock Agents, specifically Scott Young of Stoel Rives, included verbage in the security agreement stating that ISYS owned the current and pending patents, and thus improperly crafted the security agreement to secure ISYS' nonexistent ownership rights. Defendants injected this erroneous ownership into the security agreement all the while representing the security agreement document were accurate.

73. However, in reality, Sullivan personally owned all such rights and had simply licensed certain rights in those patents to ISYS that were necessary for ISYS to perform its functions, as indicated in the License Agreement.

74. Because Sullivan was neither permitted time to be assisted by counsel in reviewing the security agreement, nor given an opportunity to properly review the security agreement, he did not notice the many ways in which Computive, Murdock Sr., and one or more Murdock Agents crafted the security agreement beyond the negotiated terms to which the parties had previously agreed during the preceding eighteen months and as outlined in the License Agreement.

75. Subsequently, Computive and Murdock Sr. attempted without additional legal consideration to perfect an overreaching security interest in the property and patents in ISYS' name, instead of in Sullivan's name and beyond that which had been previously agreed upon by the parties.

76. The dramatic and material error of one or more Murdock Agents in preparing the security agreement is revealed in the fact that Computive thereafter brought suit against Sullivan for fraudulent misrepresentation of patents ownership based upon documents prepared by

13

Murdock Sr. and one or more Murdock Agents, not by Sullivan, and which Sullivan was not given adequate opportunity to properly review.

77. Murdock Sr., Computive, KAM, MI, Murdock Jr., and/or one or more Murdock Agents used telephone, facsimile, email and other forms of electronic and written communications and mail to effect the business schemes of Murdock Sr., Computive, KAM, MI and/or Murdock Jr. targeted at Plaintiffs.

<u>D2M and the Master Development Agreement</u>

78. In order to design and develop the alpha prototype required under the License Agreement, on or about August 25, 2006, and in reliance upon the agreements with and representations of Murdock Sr. over eighteen months of negotiation with Murdock Sr. for funding, ISYS entered into a master development agreement with D2M.

79. Pursuant to the master development agreement, D2M was required to provide engineering, product development and consulting services for ISYS' various electronic computer products. The specific services to be provided by D2M were limited to the alpha prototype and were expressly listed and described in a document called Statement of Work No. 1.

80. In or about September 2006, D2M began assisting in the design of the alpha prototype.

81. Computive established and maintained frequent contact with D2M personnel throughout D2M's designing and production of the alpha prototype, chiefly through Murdock Sr.'s son, Murdock Jr. Murdock Jr. was considered the technical lead for Computive in this process.

CISC Formation and Work

82. Before executing the License Agreement, ISYS and Computive understood that intellectual property theft was a significant problem for many technology companies, and caused United States companies to lose billions of dollars.

83. Therefore, in the License Agreement, ISYS and Computive agreed that ISYS would provide non-technical, manufacturing security schema designs, and Computive acknowledged that all validated designs made and sold by Computive thereafter must include the security schema specified by ISYS.

84. Accordingly, on or about April 15, 2007, Sullivan and a number of other investors collaborated to incorporate Coded Instruction Security Corporation, CISC. The investors included some of the best security designers in the world, who agreed to develop the security schema for ISYS in return for the chance to own shares in CISC.

85. CISC's purpose was to provide security solutions for ISYS products, including software and custom hardware that would only work together with the unique design of ISYS' technology and products to prevent unauthorized manufacturers from manufacturing, obtaining, and/or selling counterfeit or after-market products into the markets which markets had been created at significant effort, time and expense by ISYS' authorized licensees, including Computive.

86. After months of dedicated labor and expense, CISC developed a new, proprietary, highly-advanced security schema, which included (i) the first and only custom-built Desktop UEFI 64-bit BIOS System in the world with integrated security software that communicates with CISC's unique security chip which is placed on all Xi3™ product printed circuit boards, (ii) a specific, proprietary keyed connector that connects the printed circuit boards in the PCU™

15

products, (iii) a unique cooling system assembly, and (iv) a business model to limit the distribution of the security schema to approved ISYS licensees only.

87.     Computive established and maintained frequent contact with CISC personnel throughout CISC's development of the security schema, chiefly through Murdock Jr.

88.     In addition, Murdock Jr. maintained frequent and open communications with ISYS regarding the development of the alpha prototype and security schema and ISYS's subsequent work, submitting several requests for modifications to be made to the original design specifications for the alpha prototype but never expressing any concerns with the progression of the development work, or with the use of CISC to perform the security schema work.

<u>ISYS Completes and Delivers the Alpha Prototype</u>

89.     As set forth above, the alpha prototype was defined in the License Agreement as an alpha-release prototype built according to the specifications set forth in Exhibit E to the License Agreement and including all modifications to the original design requested in written email format from Computive's technical lead, Murdock Jr.

90.     After considerable efforts and collaboration by ISYS, CISC, D2M and Computive, on or about February 25, 2007, the alpha prototype had been developed.

91.     In fact, ISYS and D2M developed and had built three alpha prototype models.

92.     After necessary quality testing, in or about May 2007, ISYS made all three of the alpha prototypes and prototype documentation available to Computive and Murdock Sr. for review and approval, as required by the License Agreement.  ISYS specifically delivered one of the alpha prototype models to Computive and Murdock Sr. when Murdock Sr. agreed to travel to Austin, Texas to review and accept delivery of the alpha prototype models and view them in operation.

93.     Murdock Sr. requested that the alpha prototypes remain in D2M's possession to facilitate development of a beta or second design.

94.     The completed  alpha release prototype, as well as its design files  were made available and delivered to Murdock Sr., Murdock Jr., and Computive and were built specifically to the design specifications in the License Agreement, including all requested changes made by Computive throughout the design process.

95.     The alpha prototype demonstrated that the PCU™ technology functioned and met the design specifications of the License Agreement.

96.     Completion of the alpha prototype gave Computive the ability to proceed with its requirement to further develop pre-production prototypes of the technology before beginning the manufacturing process.

97.     Thus, ISYS' obligations under the License Agreement as to development and delivery of the alpha prototype were fulfilled timely, and Computive was in a position to further design and develop pre-production models through D2M or someone else.

98.     Neither Computive, nor any of its agents rejected the alpha prototype in a reasonable amount of time and, because of the satisfaction of the alpha design expressed very openly by Computive, the alpha prototype was deemed to have been accepted.

99.     Notwithstanding the successful and timely completion of ISYS' obligations under the License Agreement,  Computive did not at that time, nor has it since then, released the security agreement which had only been instituted to secure ISYS' obligation to refund those portions of up-front payments that have been paid by Computive for the alpha prototype development.

100. Computive agreed that ISYS could continue to use all three alpha prototype models to further develop a more advanced or beta prototype which would exceed the original design requirements of the License Agreement.

101. Under the apparent acceptance of the alpha prototype by Computive, ISYS at the request and with the encouragement of Computive and Murdock Sr. continued to assist Computive in the further development of the technology toward a beta or further pre-production prototype.

102. By or about August 12, 2007, ISYS had developed a second or beta prototype. Although not required by the License Agreement, ISYS also provided the beta prototype to Computive and Murdock Sr. for inspection and review.

<u>Computive Attempts To "Flip" The Company For A Large Profit</u>

103. Around the same time the beta prototype was delivered, Computive and its officers and agents were attempting to quickly sell or "flip" Computive based upon the technology that had been proven in the alpha prototype, rather than prepare for market launch as the License Agreement required Computive to do.

104. Documents internal to Computive have revealed that Murdock Sr., Murdock Jr., KAM, MI, Rhay, Jacobson, Romney, Gilbert, one or more John Does or other Murdock Agents had been distributing documents offering Computive and its valuable ISYS License Agreement rights for sale for hundreds of times more than the money Murdock Sr. and/or Computive had paid ISYS.

105. The documents distributed by Murdock Sr., Murdock Jr., KAM, MI, Rhay, Jacobson, Romney, Gilbert, one or more John Does or other Murdock Agents and used to offer the ISYS technology for sale failed to include approved trademarks and patent notices corresponding to the ISYS technology as required by the License Agreement.

18

106. On information and belief, Murdock Sr., Murdock Jr., KAM, MI, Computive and its officers and agents, including one or more Murdock Agents, knew that the necessary and desired sale value of the PCU™ technology resided in the patents and that in order to sell rights in the PCU™ technology Computive would need to obtain ownership of the patents associated with the technology. The scheme of Murdock, Computive, KAM, MI, Murdock Jr. and one or more of the Murdock Agents was to force Sullivan and ISYS to relinquish the needed patent rights.

107. Shortly thereafter, after having failed the attempt to sell Computive without the necessary patent rights, Murdock Sr., Computive, its officers and one or more Murdock Agents began attempting to sell the PCU™ technology as a package deal including ISYS, CISC and Mr. Sullivan's patents at a time when neither Murdock Sr. nor Computive held equity rights in ISYS, CISC and Mr. Sullivan's patents This attempt was rejected by Mr. Sullivan, ISYS and CISC.

108. After failing to convince Mr. Sullivan to sell his company along with Computive, Computive, its officers and one or more Murdock Agents made up frivolous and/or false claims, even lying under oath in sworn depositions, that Computive had never received a prototype of any kind for review. All in an attempt to manufacture claims of breach of the License Agreement and security agreement(s) associated with the License Agreement.

### ISYS Seeks Additional Funding

109. After providing the alpha prototype and the beta prototype to Computive, Murdock Sr. and Computive knew that ISYS, CISC and D2M continued to make advances in further designing the PCU™ technology and related products to further assist Computive to prepare the PCU™ technology for market launch.

110. In fact, ISYS began developing both a beta-plus prototype and a gamma prototype at significant additional cost and risk to Plaintiffs.

111. The gamma prototype was developed as a new, pre-production product that was not listed on Exhibit A of the License Agreement and was not part of the statement of work under ISYS' agreement with D2M. Instead of following the specifications in Exhibit E to the License Agreement, the gamma prototype was a materially different device.

112. The gamma prototype was outside the scope of the License Agreement, even though acting in good faith, ISYS was willing to help develop the gamma prototype for Computive's benefit.

113. Documentation for the gamma prototype was completed on November 25, 2007, but the actual building of prototype example devices was never completed because Murdock Sr. and Computive breached their other agreement(s) for additional funding.

114. Murdock Sr., Murdock Jr., and/or Computive and one or more other Defendants, were knowingly using ongoing business schemes to lead Sullivan down a course requiring ever increasing expenses and development costs, far beyond those costs which Sullivan, ISYS and CISC could bear alone at the time or which were required under the License Agreement. This conduct of Murdock Sr. and one or more Murdock Agents was targeted at Plaintiffs to unfairly weaken Plaintiffs' bargaining power in an attempt to cause Plaintiffs to relinquish the valuable intellectual property rights held by Plaintiffs and already being marketed by Murdock Sr. and one or more Murdock Agents to third parties unbeknownst to Plaintiffs.

115. Murdock Sr. promised additional funding as part of the schemes.

116. With promised additional funding and/or investment from Murdock Sr. and/or his related companies, Sullivan continued to sell notes to Murdock-associated entities and incur increasing expenses and development costs in good faith believing that Murdock Sr. would provide the additional funding and/or investment needed and that Murdock Sr. was agreeable with using D2M to develop pre-production prototypes consistent with Computive's

responsibility under the License Agreement. Consistent with the License Agreement, such additional expenses and development costs related to pre-production product development by D2M were obligations of Computive and Murdock Sr.

117. Murdock Sr., Computive, KAM, MI, Murdock Jr. and one or more Murdock Agents knew that the additional costs and expenses associated with monetary notes and technology design, development, and technology costs for developing the PCU™ and other products for market launch far exceeded the capital that ISYS had acquired from Computive, Murdock Sr., and other sources for these tasks.

118. Murdock Sr., Computive, KAM, MI, Murdock Jr. and one or more Murdock Agents knew at that time that ISYS and CISC were preparing a highly-valuable product for market but needed additional funding to complete their design and development work.

119. Murdock Sr., Computive, KAM, MI, Murdock Jr. and one or more Murdock Agents knew that if ISYS and CISC could not obtain additional funding at that time, they risked losing all of the value of the technology in which they had already invested millions of dollars and years of extensive effort.

120. Murdock Sr., Computive, KAM, MI, Murdock Jr. and one or more Murdock Agents knew that in addition, because of the extremely high market potential of the PCU™ and other products, ISYS and CISC risked losing out on hundreds of millions of dollars in revenues over the first few years of product sales if market launch was not accomplished.

121. Accordingly, beginning in or about June 2007, ISYS and CISC, via Sullivan and others, began seeking significant additional funding to pay for the further costs and expenses needed to bring Sullivan's technology to market.

122. On behalf of ISYS and CISC, in or about July, 2007, Sullivan spoke with Murdock Sr. to determine whether he would provide the needed additional funds.

123. In response to Sullivan's inquiries, Murdock Sr. agreed to provide additional funds via loans to ISYS through KAM.

124. In exchange for Murdock Sr. providing additional funding through Murdock Sr.'s company KAM, ISYS agreed to give Computive a credit of prepaid royalties for twice the actual amount of funds that KAM would lend to ISYS. This arrangement was presented by Boren and memorialized in a certain Prepaid Licensure Agreement with ISYS, Sullivan, and Computive dated September 14, 2007.

125. In addition, Murdock Sr. required that ISYS enter into a certain amendment to the already existing security agreement.

126. Pursuant to the amendment of the security agreement, ISYS was required to make its obligations under the Prepaid Licensure Agreement subject to the existing security agreement.

127. On information and belief, Murdock Sr. and one or more Murdock Agents had realized that Computive's existing security agreement with ISYS secured only certain of ISYS's rights to the patented technology as a licensee of Sullivan, but not all of Sullivan's ownership rights to those patents.

128. In addition, to provide the needed funding, Murdock Sr. also demanded that Sullivan personally enter into a security agreement with Computive and KAM.

129. The personal security agreement required that Sullivan grant KAM and Computive a certain security interest in the referenced patents, patent applications, intellectual property, and proceeds therefrom to secure certain obligations set forth in the Prepaid Licensure Agreement.

130. To induce Sullivan to sign the amendment to the security agreement and the personal security agreement, Murdock Sr., Computive, and one or more Murdock Agents worked a deception on Sullivan by falsely and fraudulently representing to Sullivan that the amendment to the existing security agreement and the personal security agreement were basically the same as the original existing security agreement except that they were meant to rectify a problem that Murdock Sr.'s attorney created when incorrectly describing the owner of the patents as ISYS and to include the amounts under the Prepaid Licensure Agreement.

131. Though Murdock Sr. admitted the mistake made in the original security agreement was the fault of his counsel Scott Young, he later used that mistake to sue Sullivan for fraud in a baseless lawsuit meant to force Sullivan into signing over control of ISYS and CISC and Sullivan's patents to Murdock Sr. and/or Computive.

132. ISYS and Sullivan again were not given ample opportunity to permit legal counsel to review the amendment to security agreement or the personal security agreement.

Murdock Sr. Seeks to Obtain Shares of ISYS and CISC

133. ISYS and CISC continued to seek additional and necessary funding to complete the already expensive and underway preproduction work on the PCU™.

134. In or about October, 2007, Sullivan began seeking one or more investors to provide additional capital for ISYS and CISC in exchange for ownership interests in those entities.

135. Due to Murdock Sr.'s participation in Computive, Sullivan provided Murdock Sr. individually with an opportunity to obtain shares in ISYS and CISC.

136. Murdock Sr., Murdock Jr., Rhay and others had been attempting to sell Computive and its assets for several months without being able to complete a sale because would

be buyers/investors required such a sale to include rights Computive did not hold namely the patents protecting the ISYS technology.

137. Murdock Sr. saw this as an opportunity for him to seize an ownership position in ISYS and CISC and in response, Murdock Sr. expressed a strong interest in becoming an investor in ISYS and CISC and personally providing a ruse for additional funding needed by ISYS and CISC.

138. Murdock Sr., Murdock Jr., Rhay, Jacobson and one or more other Murdock Agents and/or John Does targeted Plaintiffs with schemes to cripple Plaintiffs so Murdock Sr. could obtain and  sell intellectual property rights of ISYS, CISC and Sullivan related to Sullivan's patents without Sullivan's consent, knowing full well that Sullivan was interested in bringing the technology to market and not in a quick sale for limited gains.

139. As part of these schemes, Murdock Sr. asked Sullivan to promise Murdock Sr. that Sullivan would not seek other investors or lenders for funding in consideration for which Murdock Sr. promised that he would be the sole new investor in and funding source for ISYS and CISC, via his entities, KAM and MI, LLC, another entity which on  information and belief was wholly-owned by Murdock Sr.

140. Accordingly, Sullivan and Murdock Sr. began negotiating Murdock Sr.'s receipt of ownership interests in ISYS and CISC as a 50/50 partner of Mr. Sullivan.

141. After considerable discussion, on or about October 10, 2007, Murdock Sr. and Sullivan reached an agreement as to the material terms of Murdock Sr.'s acquisition of ownership interests in ISYS and CISC via KAM and MI (the "Acquisition Agreement").

142. Specifically, in the Acquisition Agreement, Murdock Sr. and Sullivan agreed that Murdock Sr. would pay Sullivan, ISYS, and CISC $10 million, in exchange for which Sullivan and ISYS would give Murdock Sr. via KAM and MI sufficient shares in ISYS and CISC that

24

would enable Murdock Sr. to own the same number of shares in those entities as Sullivan: 38% in ISYS and 15% in CISC, and 50% of Sullivan's patent royalties. There was a meeting of the minds as to these material terms. These terms were memorialized in a writing of the parties.

143. ISYS, CISC, and Sullivan informed Murdock Sr., and Murdock Sr. agreed that proceeds from the $10 million would be used to pay off interim loans provided by Murdock described below.

144. In addition, in the Acquisition Agreement, Murdock Sr. agreed that he would provide all needed funding for ISYS and CISC through 2007, and particularly until Murdock Sr. and Sullivan completed the terms of their contemplated transfer of ownership interest to Murdock Sr.

145. In reliance on Murdock Sr.'s promise to provide all needed funding through 2007, Sullivan ceased his other efforts to obtain funding for ISYS and CISC from others.

146. In particular, CISC needed funding for its payroll and to repay a note it had executed with another group of individual lenders. At that time, Murdock Sr. was aware of this separate note, and the pending payroll obligations.

147. Murdock Sr. had one of his agents, Elliot Jacobson, complete the terms of the Acquisition Agreement. Jacobson further memorialized the agreed upon terms in a certain term sheet or memorandum of understanding that set forth many of the basic terms of the Acquisition Agreement.

148. Personal emails between Murdock Sr. and Jacobson show that the negotiations were in bad faith and were a further attempt to weaken Plaintiffs' ability to proceed with product development and ownership and to position Murdock Sr. and Computive to acquire enough ISYS intellectual property rights to sell Computive by merely gaining an option to purchase enough shares of ISYS and CISC to participate in a sale as if they owned fifty percent (50%) of the

entities. This scheme to avoid taking product to market evidences Murdock's calculated artifice to not proceed to fund development or to bring PCU™ technology to market in good faith thereby denying ISYS its minimum royalty payments to come due under the License Agreement.

149. Pursuant to the agreed upon terms of the memorandum of understanding, Murdock Sr. began fulfilling his obligations to fund ISYS and CISC by providing four interim loans to ISYS and CISC, in the amounts of $150,000, $81,000, $81,000, and $40,000. Each loan was evidenced by a separate note and was prepared by either KAM or MI.

150. As an inducement for Sullivan to sign the notes without the freedom to seek other investors for additional or other sources of funding, Murdock Sr. and Sullivan agreed that these notes for the interim loans would not need to be paid off until Murdock Sr. paid the agreed upon $10 million payment. Murdock Sr. and one or more Murdock Agents were fully aware and foresaw that Sullivan did not have the means to pay off the notes without obtaining the promised money from Murdocks, KAM and/or MI.

151. Murdock Sr., Murdock Jr., Computive, KAM, MI and/or one or more Murdock Agents conduct in purchasing notes from Sullivan were done to intentionally manipulate Sullivan's inability to pay the notes for the interim loans. This artifice was executed by making untrue statements of material fact and/or while omitting to state material facts necessary in order to make the statements made not misleading.

152. These schemes of Murdock Sr., Murdock Jr., Computive, KAM, MI and/or one or more Murdock Agents operated as a fraud or deceit on Plaintiffs.

<u>Murdock Sr. attempts to negotiate the ability to sell ISYS and its patent rights</u>

153. On November 2, 2007, Murdock Sr., Murdock Jr., Rhay and one or more Murdock Agents, along with Sullivan, held a meeting in the offices of Jones Waldo to finalize

the details of the Acquisition Agreement. The parties went over each point of the agreement in great detail.

154. The meeting lasted for many hours and went well into the night and early hours of November 3, 2007, at which time all of the deal points were verbally agreed upon by both parties.

155. The final deal point that Murdock Sr. wanted to discuss and which had previously been kept out of all negotiations was rights which would have given Murdock Sr. the ability to force Sullivan into selling ISYS or CISC against Sullivan's will.

156. Sullivan would not agree to such rights as demanded.

157. Upon information and belief, Murdock Sr. and one or more Murdock Agents and/or John Does had already unsuccessfully attempted to sell Computive and its rights under the License Agreement to third parties before taking the PCU™ technology to market.

158. Computive and its officers and agents were repeatedly told that the required value in the technology resided in the patents and in order to sell Computive, they would need to include ownership of the patents associated with the technology.

159. Shortly thereafter, after having failed the attempt to sell Computive by itself, Murdock Sr. and one or more Agents of Murdock began a new scheme of attempting to sell the technology as a package deal with ownership interest in ISYS, CISC and Mr. Sullivan's patent rights included. Murdock Sr. and one or more Murdock Agents had altered the sales scheme to now include Computive and its "equity partners" for the amount of three hundred seventy five million dollars. ($375,000,000).

160. Murdock Sr. or one or more Murdock Agents informed Sullivan that one or more third party groups was interested in purchasing the intellectual property and requested a selling price from Sullivan.

161.    Sullivan informed Murdock Sr. that Sullivan was not interested in selling the technology or patents but desired to take the PCU™ technology to market and told Murdock Sr. that Sullivan's price for refraining from taking the PCU™ technology to market would have to be over a billion dollars.

162.    Upon information and belief, Murdock Sr. had already determined that he was not going to manufacture the technology as required by the License Agreement, but would instead force Sullivan to sign over majority ownership in ISYS and CISC, giving Murdock Sr. the ability to make a quick "flip" or preproduction sale of Computive and of the needed rights from ISYS, CISC and Sullivan for hundreds of times the amount Computive and Murdock Sr. had invested so far in the development of the PCU™ technology.

163.    Murdock Sr., Murdock Jr., Rhay, and one or more other Murdock Agents and/or John Does foresaw and agreed to execute a series of events that would put Sullivan in extreme financial distress in an attempt to force Sullivan into forfeiting enough ownership in ISYS and CISC for Murdock Sr. and Computive to be better positioned to succeed in a quick "flip" of the companies and patents for the benefit of Murdock Sr. and Computive and to the detriment of Plaintiffs in the amount of hundreds of millions of dollars.

### Murdock Sr. and Murdocks Agents Force Sullivan into a Purported Breach on the Notes by Withdrawing and Withholding Funding

164.    Upon information and belief, due to their improper obtaining of knowledge of Sullivan's significantly inferior financial situation, Murdock Sr., Murdock Jr., Computive, KAM and MI used Jacobsen, Rhay, legal counsel of Murdock Sr. and of Computive and others to empower Murdock Sr. and Computive to renegotiate with Sullivan and demand additional benefits and higher ownership percentages for Murdock Sr. contrary to the Acquisition Agreement.  Murdock Sr. and one or more Murdock Agents made the attempt.

165.    Sullivan refused to alter the terms of the Acquisition Agreement.

166. On or about November 7, 2007 ISYS and CISC requested additional funding from Murdock Sr. in the amount of $120,000. The $120,000 loan was needed for a critical debt service and to perform important development work.

167. On that same day, Murdock Sr. agreed to loan ISYS and CISC the $120,000.

168. In fact, on or about November 21, 2007, Murdock Sr., Jacobsen, Boren, McSweeney and/or Lorraine LNU initiated a wire transfer sending the $120,000 to ISYS.

169. Murdock Sr., Murdock Jr., Computive, KAM, MI and/or one or more Murdock Agents knew that Sullivan, ISYS and CISC were relying upon the $120,000 wire transfer to meet critical business needs.

170. Murdock Sr., Murdock Jr., Computive, KAM, MI and/or one or more Murdock Agents foresaw the financial distress which would befall Sullivan, ISYS and CISC if the wire transfer was not completed.

171. Accordingly, on that same day, Murdock Sr., Jacobsen, Boren, McSweeney and/or Lorraine LNU intentionally recalled and/or stopped the wire transfer knowing it would be materially harming ISYS and CISC and their personnel by causing extreme financial harm and distress.

172. Later, on or about December 3, 2007, and in contradiction with the Acquisition Agreement, Murdock Sr. demanded that he be given a controlling fifty-one percent (51%) interest in ISYS and CISC or else he would refuse to provide any further funding to ISYS or CISC.

173. In addition, Murdock Sr. threatened that if he did not receive the controlling interest in ISYS and CISC, he would file suit against ISYS, CISC, and Sullivan and foreclose on the notes of the security agreement and of the Sullivan security agreement and on the stated collateral for the notes, namely the Sullivan patents. This was Murdock Sr.'s deliberate and

29

calculated attempt to take by force ownership in the patents so he would have the ability to sell off Computive.

174. Murdock Sr., Murdock Jr., Jacobsen, Boren, McSweeney and/or Lorraine LNU knew and foresaw that by refusing to provide needed funding when ISYS had agreed to look to Murdock Sr. only for 2007 funding that ISYS and CISC would have to either succumb to Murdock Sr.'s demands or suffer irreparable damage and potentially file bankruptcy. Murdock Sr. used the information he had extracted from Sullivan to apply financial pressure on ISYS and CISC in the manner that he knew was most severe.

175. On information and belief, Murdock Jr., Jacobson, Rhay, counsel for Murdock Sr. and for Computive and others encouraged and assisted Murdock Sr. in asserting Murdock Sr.'s demand for a majority interest in ISYS and CISC and breaching the Acquisition Agreement.

176. At that time, Murdock Sr. had his counsel prepared a series of knowingly unfair agreements for Sullivan, ISYS, and CISC to sign (the "Takeover Agreements"). The Takeover Agreements purported to give Murdock Sr., via his wholly-owned subsidiaries, the right to purchase half of Sullivan's shares for only $500,000. In addition, the Takeover Agreements granted Murdock Sr. the right to all of Sullivan's and ISYS's rights in the patents, intellectual property, and all other property they owned.

177. The Takeover Agreements were so onerous and unconscionable that at least one attorney in the office of counsel for Murdock refused to be a part of the transaction and remarked to Sullivan that Sullivan was being mistreated.

178. The Takeover documents tried to hide the takeover nature of the circumstances by writing in bold print that Sullivan would be signing the agreements by his own free will and that he was not being coerced or signing under duress.

179. To add additional duress and to coerce Sullivan into signing the documents at that meeting, again without representation, Murdock Sr. and one or more Murdock Agents presented Sullivan with a copy of a lawsuit that Murdock Sr. and Computive threatened to file if Sullivan did not turn over control of ISYS and CISC to Murdock Sr.

180. Due to the fact that Sullivan was in fact under severe duress and was being coerced under the fear of losing everything, Sullivan could not and did not sign the Takeover Agreements.

181. In a recorded conversation between Murdock Sr. and Rhay shortly after the meeting, Rhay and Murdock discuss their attempts to strong-arm Sullivan to force the takeover.

182. Thus, Murdock Sr., Murdock Jr., Computive, KAM and/or MI with the help and assistance of one or more Murdock Agents and/or John Does attempted to take over Sullivan's technology for a relatively small sum of money in order to "flip" Computive and/or ISYS for hundreds of times Murdock's intended investment amount.

183. When Sullivan refused to sign the Takeover Agreements which were inconsistent with the Acquisition Agreement, Murdock Sr., Jacobsen, Boren, McSweeney and/or Lorraine LNU and/or one more John Does refused to provide ISYS and CISC with the 2007 funding Murdock Sr. had agreed to provide under the Acquisition Agreement.

184. ISYS, CISC, and Sullivan again requested Murdock Sr. to provide the money he had promised to pay to prevent certain and foreseeable losses to ISYS and CISC, citing their reliance on Murdock Sr.'s representations in the Acquisition Agreement, Murdock Sr.'s corresponding requirement that they not seek funding from other sources and ISYS' and CISC's compliance with that requirement, and their timely and vital need for the funding in 2007. However, Murdock Sr., Murdock Jr., Jacobsen, Boren, McSweeney and/or Lorraine LNU and or more John Does steadfastly refused.

185. On December, 11 2008, one of Murdock Agents, Brian Rhay assisted Murdock Sr. in discussing and promoting the Takeover Agreements.

186. In addition Rhay, a shareholder of ISYS, with the assistance of legal counsel of Murdock Sr. and Computive, inappropriately attempted to obtain ISYS's financial information by feigning a shareholder request for information solely to assist Murdock Sr. in making his demands and to ascertain that Sullivan, ISYS, and CISC did not have the financial ability to defend themselves when Murdock Sr., Murdock Jr., Jacobsen, Boren and/or others positioned Murdock Sr. and Computive in preparation for filing the lawsuit Murdock Sr. had threatened on earlier occasions.

187. Murdock Sr. believed that without the ability to defend themselves, Sullivan, ISYS, and CISC, would be succumb to Murdock Sr.'s takeover demands if he were to file suit against them.

188. On about December 17th, 2007, Sullivan met with Murdock Sr., Murdock Jr., and Rhay in one last attempt at a fair negotiation for the 2007 funds promised by Murdock Sr. to ISYS and CISC.

189. The entire meeting was recorded by Murdock Jr. and without Sullivan's knowledge.

190. In the recording of the meeting Murdock Sr. can be heard exerting unreasonable pressure and threats upon Sullivan.

<u>Murdock Sr. and others file Bad-Faith Takeover Lawsuit</u>

191. After attempting to coerce and intimidate Mr. Sullivan to sign over control during negotiations, Murdock Sr. and Murdock Agents crafted frivolous claims in a lawsuit to provide additional pressure on Sullivan. The claims were inconsistent with the Acquisition Agreement and the other agreements of the parties.

192. The lawsuit was brought in bad faith in another attempt in the coordinated scheme of Murdock Sr., Murdock Jr., Computive, KAM, MI and/or one or more Murdock Agents to inappropriately and unlawfully seize control of Sullivan's companies and patents.

193. It was the targeted plan of Murdock Sr., Murdock Jr., Computive, KAM, MI and/or one or more Murdock Agents in the filing of the lawsuit to apply an overwhelming amount of pressure and duress on Mr. Sullivan so as to cause him to give into their takeover demands and relinquish control of his companies, giving Murdock Sr. and Murdock Sr., Murdock Jr., Computive, KAM, MI and/or one or more Murdock Agents the ability to sell the companies for hundreds of millions of dollars.

194. Recorded conversations among Murdock Sr., Murdock Jr., Computive, KAM, MI and/or one or more Murdock Agents discussed that they did not expect that Sullivan would have the ability to defend the lawsuit and that it would only be a matter of time before he would be forced to take the inequitable offer Murdock Sr. had presented Sullivan.

195. After the final meeting with Sullivan and just one day before the filing of the takeover lawsuit, Murdock Sr. and Rhay are heard discussing the possible outcome of the next day's attempted signing with Sullivan.

196. In the recording, Murdock Sr. asks Rhay if he thinks Sullivan will show up the next morning and sign over control of his companies.

197. Rhay responds that Sullivan will "show" because he was a "hooked fish" and the following conversation ensues:

> Rhay: Oh no, he'll come. He'll try to come and get it done because he knows right now he's ******.  Ken, somebody's going to pay you for something, or somebody's going to take it from you, and then you aint got ****, except for more debt. Over here I get paid and I have a job, and over here I have nothing.  It's ****** easy.
>
> Murdock Sr.: Yeah if doesn't show...

Rhay: You don't think his attorneys are like "let's fight it". What are they going to fight? How are they going to fight it?

Murdock Sr.: Well they said it would cost him a million, more than a million dollars

Rhay: Yeah but they're like, "to fight it, not to win it".

Murdock Sr.: True.

198. Murdock Sr. never requested the money he had paid as prepaid licensure be returned before the filing of the takeover lawsuit because Murdock Sr. did not want his money back, he wanted to own ISYS, CISC and the Sullivan patents worth so much more.

199. Murdock Sr., Rhay, Jacobsen and others also foresaw that the filing of the takeover lawsuit against Sullivan, ISYS, and CISC would make it nearly impossible for Sullivan and ISYS to obtain funding from another investor.

200. As a result, Murdock Sr., Rhay, Jacobsen and others believed Sullivan would be motivated to take their bad faith offer and that Murdock Sr. would gain the ability to sell Sullivan's companies and patents to the highest bidder.

201. As certain and foreseeable results of the refusal of Murdock Sr., Murdock Jr., Rhay, Jacobsen, Boren, McSweeney and/or Lorraine LNU to wire the money which Murdock Sr. had promised to ISYS and CISC and to otherwise provide the agreed-upon funding, in December, 2007, ISYS and CISC were unable to pay its employee's payroll from November 16 to December 31, 2007.

202. In addition, ISYS was unable to service debt known to Murdock Sr. including fulfilling ISYS's obligations to vendors and note holders or reimburse the business expenses personally paid by several employees in further development of PCU™ technology to prepare products for market for the benefit of Computive.

203. Accordingly, ISYS and CISC lost employees, checks were overdrawn on their accounts, significant amounts of valuable and essential equipment were sold at "fire sale" prices,

the credit reports of key employees were damaged, promises to pay vendors and note holders were broken, and many families suffered during the Christmas season of 2007.

204. Prior to refusing to provide needed funds to ISYS, Murdock Sr., Murdock Jr., Rhay, Jacobsen, Boren, and others were aware that the foregoing results would occur.

205. Murdock Sr., Murdock Jr., Computive, KAM, MI and/or one or more Murdock Agents caused ISYS's and CISC's good will to be harmed; vendors became reluctant to supply – or have even refused to provide – additional goods, services, or assistance to ISYS or CISC in developing products.

206. Murdock Sr., Murdock Jr., Computive, KAM, MI and/or one or more Murdock Agents caused irreparable damage to key relationships with multi-billion dollar partners such as Intel.

207. The millions of dollars spent by Intel on Intel-based prototypes were wasted, as the Intel-based product was never able to make it to market.

208. Murdock Sr., Murdock Jr., Computive, KAM, MI and/or one or more Murdock Agents forced ISYS, CISC, and Sullivan to have to start from scratch, spending years and additional millions of dollars rebuilding relationships, re-hiring key individuals and redesigning the next generation of the PCU and Xi3 architecture with different partners.

209. Moreover, because Murdock Sr. had assured Sullivan, ISYS, and CISC that he would provide all needed funding for them in 2007, they were harmed by Murdock Sr.'s and others' deliberate, intentional, and malicious failure to release the additional monies needed which caused Sullivan , ISYS and CISC to refund and rebuild over the next years,

210. Prior to refusing to provide needed funds to ISYS and CISC, Murdock Sr., Murdock Jr., Murdock Jr., Rhay, Jacobsen, Boren, and others were aware that the foregoing results would occur.

35

211.    Moreover, as a result of Murdock Sr.'s failure to wire the additional funds he had promised to pay through the end of 2007 and subsequent bad-faith lawsuit, D2M, the vendor responsible for developing the prototypes, subsequently refused to release the technical design data and files for the pre-production prototypes to ISYS or Sullivan.

212.    The filing of the take-over lawsuit   halted and indefinitely delayed ISYS's receipt of revenues based on the Xi3™ technology being introduced into the market as licensed to Computive and prevented the final Intel-based prototype from ever being sold in the market place.

213.    The Xi3™ technology, like all computer technology, will become progressively irrelevant and ultimately obsolete if not brought to market before competitors catch up with or otherwise compete with or design around the Xi3™ technology.

214.    Patents only have a useful life of twenty years from the date of filing and the take-over lawsuit delayed revenue from the patents by at least three years, which will result in untold millions of dollars in losses when the patents expire three years earlier in the production lifecycle then if the original Intel design had made it into the market place as planned.

215.    Murdock Sr.'s breach of the Acquisition Agreement and Murdock Sr.'s agents filing of the takeover lawsuit is currently costing ISYS significant royalty revenues, and may ultimately cost ISYS hundreds of millions of dollars in lost revenues.

216.    On or about December 13, 2007, Computive, KAM, and MI filed their take over lawsuit in state court in Utah, civil no. 070917500 (pending).  In that action, a number of claims of ISYS, CISC, and Sullivan have been dismissed via summary judgment (Memorandum Decision, March 22, 2010).  ISYS, CISC, and Sullivan sought thereafter to add additional claims based on further conduct of Murdock and others.  In an April 14, 2011 Order, the district court

denied a motion to add claims inviting a separate action instead.  This action is the result of that invitation.

<u>Defendants' Further Wrongdoing</u>

217.    The primary purpose of filing the takeover lawsuit was to impede ISYS' ability to seek financing from alternative sources on terms more favorable than those offered in the one-sided take over agreements by Computive both before and after the filing of the lawsuit.

218.    ISYS requested several times that Computive place the takeover lawsuit under seal.  However, Computive refused to do so.

219.    On information and belief, Computive's refusal to place the takeover complaint under seal was a direct attempt to thwart any chance of Sullivan, ISYS, or CISC in obtaining additional funding from another source.

220.    On information and belief, Murdock Sr. is the manager and owner, directly or indirectly, of each of the Computive, KAM and MI.

221.    Murdock Sr. controlled, influenced and/or authorized all of the acts of Murdock Jr., Computive, KAM and MI.

222.    On information and belief, Murdock Sr. has directly or indirectly managed, coordinated, controlled, influenced and/or authorized  the efforts and conduct of Murdock Agents and/or John Does.

223.    All the efforts and conducts of the Murdock Agents  and others and/or John Does were taken at Murdock Sr.'s direct or indirect instruction and/or with his approval or support.

224.    Murdock Sr., Murdock Jr., Computive, KAM, MI and one or more Murdock Agents and one or more John Does , knowingly used multiple, ongoing business schemes including written documents, use of computers and computer information without authorization in interstate commerce, negotiations, faked funding opportunities, interference with potential

investors, false representations and/or other conduct directed at Plaintiffs to seek to force the transfer of ownership or control of the PCU and Xi3 technologies and of ISYS and CISC to Murdock Sr. and/or Computive from Sullivan thereby causing material harm and damage and delaying the introduction of the PCU and Xi3 technologies into the market and delaying revenue streams to Plaintiffs.

225. Multiple attempts to assess the financial situation of ISYS and CISC after the filing of the bad-faith lawsuit were made by Murdock Sr. and one or more Murdock Agents.

226. For example, posing as a feigned opportunity to receive investment, Blake, CEO of Lendio (formerly Funding Universe), under the direction of Murdock Sr., convinced Sullivan to attend a speed pitch event at Funding Universe in mid 2008.

227. Murdock Sr. arranged for Kanarowski, a prominent investor in the community and also under Murdock Sr.'s direction and control, to record Sullivan's investment pitch, asking key and pre-conceived questions in an attempt to get Sullivan to misspeak or say something contrary to investment solicitation law.

228. Acting as an agent for Murdock Sr., Blake and Kanarowski allowed the recording to take place despite the non-disclosure agreement signed by all parties in attendance at the event.

229. Such action was a breach of the non-disclosure agreement by Blake, as well as by Kanarowski induced by Murdock Sr..

230.

231. On information and belief, Warnock acting as an agent of Murdock Sr. also attempted to deter potential investors away from ISYS and its related technologies.

232. One or more other Murdock Agents also made repeated attempts to distract or delay other funding efforts by Sullivan and ISYS.

233. On information and belief, during discovery in state court proceedings of the takeover lawsuit, Murdock Sr., Murdock Jr., Computive, KAM, MI and/or one or more Murdock Agents obstructed responses to ISYS' subpoena on Jeff Romney and Les Gilbert.

234. During discovery in state court proceedings Murdock Sr. and/or Murdock Agents including counsel colluded with Rhay to gain access to confidential business information of ISYS for Murdock Sr.'s takeover tactics.

235. After filing suit against Plaintiffs in state court proceedings, and in furtherance of their scheme directed at Plaintiffs, Murdock Sr., Murdock Jr., Computive, KAM, MI and/or one or more Murdock Agents or John Does knowingly destroyed evidence related to disputes and litigation among the parties including but not limited to copies of emails, hard drives, electronic files, electronic backup files and data on servers of Computive and/or servers used by Murdock Sr., Rhay and/or Murdock Jr.

236. On information and belief, during the course of the takeover lawsuit in state court proceedings Murdock Sr., Murdock Jr., Computive, KAM, MI and/or one or more Murdock Agents made false representations to the Federal Bureau of Investigation in a attempt to find a way to pressure Sullivan to come back to the negotiation table.

Certain Actionable Conduct of the Defendants

237. Since 2010, Defendants have continued with their repeated attempts to deter potential investors from investing in ISYS.

238. On information and belief, under the direction of Murdock Sr., Hall, another prominent investor and technology advisor in the community acting as an agent for Murdock Sr. made repeated attempts to deter new investors from investing in ISYS.

239. Hall disparaged the Xi3 technology when speaking with one or more potential investors, in the final stages of due diligence for a multi-million dollar investment and counseled them against investing in the Xi3 technology.

240. On information and belief, after learning of new, potential third-party investors, Martin Frey and one or more John Does, acting as agents of Murdock Sr., attempted to lure the potential investor to a private meeting where they would untruthfully explain why he should not invest in the Xi3 technology.

241. After the Salt Lake Tribune published an in-depth article on ISYS and its newly formed subsidiary Xi3 Corporation, Murdock Sr., Murdock Jr., Computive, KAM, MI and/or one or more Murdock Agents made defamatory and disparaging statements in public comment and/or to others stating that Sullivan and his companies are a bunch of swindlers including once you are a Madoff you can't stop.

242. Murdock Sr. or a Murdock Agent or John Doe by the alias "Mitchell Raymond" made public comments stating that he had insider knowledge from investors and that the production of the prototype units were failing and, while posing as a NASA aerospace engineer tried to debase the product by stating that they have really not developed anything new.

243. Furthermore, after hearing that ISYS had won an innovations award for its newly designed AMD-based Xi3 Modular Computer, Computive, Murdock Sr., and Murdock Agents consulted counsel and threatened to a restraining order preventing ISYS from attending the Consumer Electronics Show in January of 2011 in Las Vegas where its product would be on display as an award winner.

244. The preceeding seven paragraphs constitute separate actionable conduct of Defendant since late 2010 ("Certain Actionable Conduct").

## FIRST CLAIM FOR RELIEF
### (Defamation/Disparagement—Murdock Sr. and/or one or more Defendants)

245. Plaintiffs reallege and incorporate by reference herein the Certain Actionable Conduct of Defendants.

246. Murdock Sr. and/or one or more Defendants have published statements concerning Plaintiffs that are false and defamatory.

247. Such Defendants have published these statements intentionally, willfully, knowingly, maliciously, and with reckless disregard for the truth of the statements, for the purpose of causing damage to Plaintiffs.

248. Plaintiffs have been, and will continue to be, damaged by these false and defamatory statements.

249. Plaintiffs are entitled to judgment against such Defendants for the actual damages Plaintiffs have sustained as a result of the aforementioned defamatory and/or disparaging statements in an amount of at least three million dollars and additional amounts to be determined at trial, together with interest and costs as permitted by common law or unfair competition laws including 15 U.S.C. § 1125(a).

250. Plaintiffs are also entitled to recover punitive damages in an amount sufficient to deter such Defendants and others like them from engaging in such activities, but in any event, not less than $5 million. Plaintiffs are also entitled to an order enjoining such Defendants from making any further defamatory statements about Plaintiffs.

## SECOND CLAIM FOR RELIEF
### (Interference with Prospective Economic Relations—Murdock Sr. and/or one or more Defendants)

251. Plaintiffs reallege and incorporate by reference herein the Certain Actionable Conduct of Defendants .

252. Plaintiffs had prospective economic relationships with the purchasers of its products, and also other sources of financing including potential investors.

253. Murdock Sr. and/or one or more Defendants have intentionally interfered with Plaintiffs prospective economic relationships with the purchasers of its products and other sources of financing.

254. Defendants have thus interfered with Plaintiffs' prospective economic relations by the improper means of intentionally causing financial harm, including but not limited to, making false statements and representations regarding Plaintiffs, as set forth above.

255. The interference of Defendants was for an improper purpose because its predominant purpose in performing the aforementioned acts was to keep Plaintiffs from selling products to customers, or obtaining other sources of financing.

256. As a direct and proximate result of the interference of Defendants, Plaintiffs have been injured and incurred damages, in an amount to be determined at trial.

257. Plaintiffs are further informed and believe, and thereupon allege, that the interference of Defendants with Plaintiffs' prospective economic relations was willful, malicious, and intentional, and was committed with a knowing and reckless indifference toward, and a disregard of, the rights of others, including Plaintiffs thus entitling Plaintiffs to punitive damages.

### THIRD CLAIM FOR RELIEF
### (RICO Title 18 Chapter 96 U.S.C.—Murdock Sr. and one or more Defendants)

258. Plaintiffs reallege and incorporate by reference herein all of the above paragraphs.

259. The business schemes of Murdock Sr. and Defendants were directed to Plaintiff including mail fraud, wire fraud, computer fraud, obstruction of justice, tampering with a witness, interference with commerce, fraud in the sale of securities ("Unlawful Business Schemes").

260. The Unlawful Business Schemes targeted Plaintiffs and Plaintiffs' interests being handled by agents of Plaintiff.

261. Murdocks Sr. and one or more Defendants constituted an enterprise having an ongoing organization with a decision-making mechanism for controlling the group in effecting the Unlawful Business Schemes.

262. Murdocks Sr. and one or more Defendants constituted an enterprise whose various associates functioned as a continuing unit to effect the Unlawful Business Schemes.

263. Murdocks Sr. and one or more Defendants constituted an enterprise which existed separate and apart from the Unlawful Business Schemes.

264. The injuries caused to Plaintiffs were foreseeable and created concrete financial losses caused by the lack of funding needed to bring the PCU and Xi3 products to market, by delaying the market entry of the PCU and Xi3 products to the market, by delaying revenue streams to Plaintiffs from the sale of the PCU and/or Xi3 products and by the subsequent expense of identifying and securing other funding for product development and defending against the takeover lawsuit.

265. As a result of Defendants' pattern of racketeering conduct, Plaintiffs have been harmed in the amount of at least two hundred million dollars and additional amounts to be proven at trial.

266. Because Defendants' conduct was willful and malicious, Plaintiffs are entitled to any associated punitive damages, if any, and attorney fees.

### FOURTH CLAIM FOR RELIEF
### (Securities Fraud Utah Code 61-1-1 et seq.—Murdock Sr. and one or more Defendants)

267. Plaintiffs reallege and incorporate by reference herein all of the above paragraphs.

268. Murdock Sr. and one or more Defendants purchased or caused to be purchased securities in the form of notes from one or more Plaintiffs.

269. In the course of events leading up to, during and after the purchase of such securities, one or more Defendants made untrue statements of material facts and/or omitted making statements of material facts which would have made other statements not misleading.

270. Defendants had knowledge of the untrue and misleading nature of their statements and omitted statements.

271. Such statements were made in connection with purchasing securities from one or more Plaintiffs.

272. The Plaintiffs selling the securities relied upon the statements.

273. One or more Defendants purchased or caused to be purchased securities in the form of notes from one or more Plaintiffs. The statements have caused damage to one or more Plaintiffs.

274. The damage to one or more Plaintiffs is at least three million dollars and additional amounts will be proven at trial.

275. The knowing, fraudulent and deceitful nature of the statement and the resulting damage to Plaintiffs entitles Plaintiffs to an award of attorney fees and any associated punitive damages, if any.

**FIFTH CLAIM FOR RELIEF**
**(Spoliation of Evidence —Murdock Sr., Murdock Jr., Computive, KAM, MI, Rhay and one or more Murdock Agents or John Does)**

276. Plaintiffs reallege and incorporate by reference herein all of the above paragraphs.

277. The parties have been engaged in different stages of disputes and threatened litigation or litigation since 2007.

278. Defendants had knowledge of the disputes and threatened and actual litigation.

279. Defendants willfully destroyed and/or discarded evidence after knowing of a legal dispute and/or after being made a party to litigation.

280. Defendants destroyed and/or discarded evidence in order to disrupt Plaintiffs' case.

281. Defendants' destruction of evidence has disrupted Plaintiffs case in copending action Computive v. Isys et al., no. 070917500 (Utah 2007).

282. Defendants' destruction of evidence has impaired Plaintiffs ability to defend itself and prosecute its claims against Defendants and has caused Plaintiffs damage in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF
### (Negligent Spoliation of Evidence —Murdock Sr., Murdock Jr., Computive, KAM, MI, Rhay and one or more Murdock Agents or John Does)

283. Plaintiffs reallege and incorporate by reference herein all of the above paragraphs.

284. Defendants owed Plaintiff a duty to preserve evidence related to the known legal disputes, threatened and/or pending lawsuits with Plaintiffs.

285. Defendants breached that duty by willfully and intentionally destroying evidence related to the known legal disputes, threatened and/or pending lawsuits with Plaintiffs.

286. Defendants breach is the proximate cause of damage to Plaintiff.

## SEVENTH CLAIM FOR RELIEF
### (Breach of Contract — Computive)

287. Plaintiffs reallege and incorporate by reference herein all of the above paragraphs.

288. In the License Agreement Computive agreed that products related to the licensed technology would be marketed bearing Xi3 approved trademarks and patent notices.

289. One or more Defendants marketed the licensed technology to prospective buyers without using the required Xi3 approved trademarks and patent notices.

290. This failure of attribution to Plaintiffs caused harm and monetary damage to Plaintiffs by diverting potential revenue streams from Plaintiffs to Computive.

291. Defendants conduct was willful and intentional.

292. Plaintiffs have been harmed in an amount of at least three million dollars and in additional amounts to be determined at trial.

### EIGHTH CLAIM FOR RELIEF
### (Inducing Breach of Contract — Murdock Sr. and Murdock Agents)

293. Plaintiffs reallege and incorporate by reference herein all of the above paragraphs.

294. In the License Agreement Computive agreed that products related to the licensed technology would be marketed bearing Xi3 approved trademarks and patent notices.

295. Under the direction of Murdock Sr. and one or more Murdock Agents, one or more Defendants marketed the licensed technology to prospective buyers without using the required Xi3 approved trademarks and patent notices.

296. This failure of attribution to Plaintiffs caused harm and monetary damage to Plaintiffs by diverting potential revenue streams from Plaintiffs to Computive.

297. The conduct of Murdock Sr. and one or more Murdock Agents was willful and intentional.

298. Plaintiffs have been harmed in an amount of at least three million dollars and in additional amounts to be determined at trial.

### PRAYER

WHEREFORE, Plaintiffs pray the court to grant them judgment against Kenneth A. Murdock, Kenny K. Murdock, Computive Corporation, KAM Systems, LLC, MI LLC, Eliot Jacobsen, Brian Rhay, Hugo Boren, Brock Blake, Lendio, Inc., Emma McSweeney, Lorraine LNU, Stan Kanarowski, Steve Muir, Allan Hall, Jeff Romney, Les Gilbert, Greg Warnock, Martin Frey and/or John Does as follows:

1. On Plaintiffs' First Claim For Relief, judgment for actual damages Plaintiffs have sustained as a result of the defamation and or disparagement, in an amount of at least three million dollars and to be further proven at trial, but in no event less than $5 million, as well as an order enjoining Defendants from making any further defamatory and/or disparaging statements about Plaintiffs, together with interest at the legal rate, punitive damages of $ 5 million, and Plaintiffs' costs and attorney fees incurred herein; and

2. On Plaintiffs' Second Claim For Relief judgment for actual damages Plaintiffs have sustained as a result of the interference with their prospective economic relations, in an amount of at least three million dollars and to be further proven at trial, as well as an order enjoining Defendants from further interference together with interest at the legal rate, punitive damages, and Plaintiffs' costs and attorney fees incurred herein;

3. On Plaintiffs' Third Claim For Relief judgment for racketeering influenced conduct which was targeted at and caused harm and damage to Plaintiff and Plaintiff's interests in an amount of at least three million dollars and to be further proven at trial;

4. On Plaintiffs' Fourth Claim For Relief judgment for securities fraud for all actual damage permitted by law in an amount of at least three million dollars, additional amounts to be proven at trial, and attorney's fees;

5. On Plaintiffs' Fifth Claim For Relief judgment that certain Defendants spoliated evidence thereby harming Plaintiff in an amount of at least three million dollars and to be further proven at trial;

6. On Plaintiffs' Sixth Claim For Relief judgment that certain Defendants negligently spoliated evidence thereby harming Plaintiffs in an amount of at least three million dollars and to be further proven at trial;

47

7.      On Plaintiffs' Seventh Claim For Relief for breach of contract judgment that Defendants failed to properly attribute the Xi3 technology to Plaintiffs and thereby harmed the goodwill and reputation of Plaintiff and caused monetary damage to Plaintiffs in an amount of at least three million dollars and to be further proven at trial;

8.      Plaintiffs' Eighth Claim For Relief for inducing breach of contract judgment that Defendants failed to properly attribute the Xi3 technology to Plaintiffs and thereby harmed the goodwill and reputation of Plaintiff and caused monetary damage to Plaintiffs in an amount of at least three million dollars and to be further proven at trial;

9.      On all claims for relief, injunctive relief, punitive damages as permitted by law, attorneys fees and such further relief as the court deems just in the premises.

DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims.


DATED this 21st day of February, 2012.

KIRTON & McCONKIE

By:    s/Todd E. Zenger
Todd E. Zenger
Dax D. Anderson

Attorneys for Plaintiffs
Isys Technologies, Inc., Coded Instruction
Security Corporation, and Jason A. Sullivan

4826-0840-7566.1